Filed 5/9/23  In re D.G. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re D.G., a Person Coming Under the Juvenile Court Law. | D081323 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J520568) |
| v. | |
| L.W. et al., | |
| Defendants and Appellants. | |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge.  Affirmed in part, conditionally reversed in part with directions.

Jamie A. Moran, under appointment by the Court of Appeal, for Defendant and Appellant, L.W.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant, S.M.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

L.W. (Mother) appeals a juvenile court order summarily denying her petition under Welfare and Institutions Code, section 388[1] to change the order that terminated her reunification services and set the matter for hearing under section 366.26. She further contends the court erred in finding that the beneficial parent-child relationship exception did not apply to prevent termination of her rights under section 366.26, subdivision (c)(1)(B)(i). S.M. (Father) joins in Mother's arguments. Father also separately appeals the order terminating his parental rights, arguing that the juvenile court improperly found that the Indian Child Welfare Act (ICWA) did not apply. Father contends the juvenile court and the San Diego County Health and Human Services Agency (Agency) failed to further inquire whether D.G. was an Indian child after Father disclosed possible Indian ancestry. Mother joins in Father's argument. The Agency concedes it did not fully comply with aspects of its ICWA inquiry duties, and therefore agrees that a limited remand is appropriate.

We conclude the juvenile court did not abuse its discretion in summarily denying Mother's section 388 petition and in determining that Mother's relationship with D.G. did not outweigh the benefits of adoption. However, because we agree that the Agency did not satisfy its statutory burden of inquiry and that the juvenile court's ICWA finding was not adequately supported as a result, we conditionally reverse the order terminating parental rights, and remand for the limited purpose of

---

1    Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

2

compliance with ICWA and section 224.2. In all other respects, we affirm the order.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### *Initial Proceedings*

Mother and presumed mother (B.G.)[2] were in a romantic relationship for several years. While B.G. was incarcerated, Mother had what she described as a one-night stand with Father and became pregnant. She said "[t]he animosity [with B.G.] began when I got pregnant while she was in jail." But the women initially remained together, and Mother reported that B.G. is listed as a parent on D.G.'s birth certificate. Even after the mothers subsequently ended their relationship, they continued to co-parent D.G.

In early September 2020, Mother and B.G. engaged in a physical altercation at Mother's home and both sustained facial lacerations. Mother stated that she placed D.G. on the bed before the fighting began and D.G. was not injured. Law enforcement determined that Mother was the dominant aggressor, arrested her for domestic battery, and contacted the Agency. The Agency created a safety plan with Mother wherein Mother and D.G.'s maternal grandmother agreed to call the police if B.G. came to the home or threatened violence. Mother also agreed to obtain a restraining order against B.G.

The Agency learned in late September that B.G. had punched and strangled an ex-girlfriend until she briefly lost consciousness. Police arrested B.G. and found two pocketknives and a glass pipe with brown or black residue in her possession. Although Mother initially claimed that her adult

---

[2] B.G. is not a party to this appeal and will be discussed only when relevant for context.

3

daughter was caring for D.G. during the altercation, the Agency later learned that the baby was present during the incident. D.G. was uninjured and B.G.'s wife reported that she returned D.G. to Mother following the fight. The Agency also learned that B.G. had been to Mother's home in violation of the safety plan, and that Mother had not sought a restraining order.

After many unsuccessful attempts to reach Mother in person, by telephone, and via text message, Mother finally agreed to create a new safety plan in mid-October. The plan required Mother to prohibit unsupervised visits between B.G. and the baby, obtain a restraining order, and contact the family court to obtain custody of D.G.

In early November, B.G. arrived at a Child Welfare Services office to inquire about the case and admitted that she and Mother alternated caring for the baby. Two days later, a social worker met with B.G. to discuss the case, but while the social worker called Mother, B.G. drove off with the baby. When contacted by the social worker, B.G. would not disclose the baby's location. B.G. did not arrive at Mother's home with D.G. until 90 minutes later. In the meantime, Mother told a social worker she wanted to continue co-parenting with B.G. and did not feel she needed a restraining order or custody. Both Mother and B.G. agreed to drug test but neither did so.

A.    *Initiation of Dependency Proceedings Through Disposition*

The Agency filed a petition in November 2020 alleging that then five-month-old D.G. was a child within the jurisdiction of the juvenile court under section 300, subdivision (b). The petition alleged D.G. was at substantial risk of suffering serious physical harm because her mothers repeatedly exposed her to violent physical altercations and minimized the violence and its impact on D.G. The Agency expressed concern that it often could not reach either of the mothers, that Mother lied about D.G. being present during the domestic

4

violence incident between B.G. and her girlfriend, that B.G. would not disclose the baby's location, and that Mother violated both safety plans. It did not explore relative placement because it considered Mother and B.G. to be flight risks. Instead, the Agency obtained a protective custody warrant and detained D.G. at a confidential foster home.

During initial questioning pursuant to the ICWA, Mother indicated that she might have Blackfoot heritage,[3] but was not registered with the tribe. She said she did not know if Father had Native American ancestry. B.G. told a social worker she believed she had Native American heritage but did not know the name of the tribe. The social worker indicated on an ICWA-010(A) form that her inquiry gave her reason to believe the child is or might be an Indian child. At the detention hearing, the juvenile court granted B.G. presumed mother status and deferred making a finding as to whether the ICWA applied.

In its December 2020 report, the Agency noted that Mother had provided the names and dates of birth of her paternal grandmother, whom she believed "may have been Blackfoot," and her paternal great grandfather. Both relatives were deceased, and Mother could not think of any living relatives who might have further information.

When asked about drug use, Mother reported that she smoked one to two marijuana joints a day to alleviate stress and pain due to nerve damage. She said she had used narcotics about 10 years prior, but presently only drank alcohol socially and smoked marijuana. Although she was prescribed medication for anxiety, she indicated that she had been waiting until after

---

[3]    Although Mother references the "Blackfoot" tribe, we refer to the tribe as Blackfeet, as it is listed in the Federal Register. (See 80 Fed. Reg. 1942 (Jan. 14, 2015).)

pregnancy to start taking it and had not yet begun. B.G. stated that she had been clean of marijuana and alcohol for almost two years. She acknowledged using methamphetamine three to four years prior but said she "did not get into it."

Meanwhile, the foster mother reported that D.G. was generally a "happy baby" and was easy to soothe. D.G. was diagnosed with "[f]ailure to [t]hrive" and weighed only nine pounds upon entering foster care.

The Agency referred both mothers to the Family Visitation Center (FVC) for in person visits, but the FVC closed their cases in January due to failure to attend and tardiness. A social worker resubmitted their request for visits. The Agency also referred both mothers to domestic violence groups and a substance abuse specialist.

In November and December of 2020, Mother visited virtually with D.G. six times. She missed most of her January visits and so the caregiver allowed an extended visit on January 28, 2021. B.G. had three virtual visits with D.G. between November and January, all of which were rescheduled by B.G. after missing the original dates.

In its February report, the Agency noted that on January 29, 2021, its ICWA liaison emailed a follow up to the informal ICWA inquiry it apparently previously sent to a representative of the Blackfeet tribe. On February 1, 2021, the liaison called the number listed on the Federal Register for the Blackfeet tribe and two additional numbers for the tribe, but was unable to leave messages at any of the numbers.

At the February 2021 contested adjudication and disposition hearing, the juvenile court sustained the petition. The Agency requested a continuance to investigate Mother's ICWA claims and explained that it would not pursue further ICWA inquiry as to B.G. because she was not a biological

6

or adoptive parent. The court agreed and deferred disposition to allow further ICWA inquiry regarding Mother only.

The Agency's ICWA liaison reported that he sent an informal ICWA inquiry letter via certified mail to the Blackfeet tribe on April 1, 2021. He also emailed the inquiry to the tribal representative on the same date and left a follow up voicemail a few days later.[4]

Mother had four in person visits with D.G. in March. The visitation monitor reported that she arrived on time and engaged appropriately and lovingly with D.G.

As of April 2021, neither mother had participated in their domestic violence groups, although they each began receiving individualized domestic violence education. Mother engaged in online parenting education classes, but B.G. missed most of the classes and was dropped from the program. Mother did not contact the substance abuse specialist because she said she did not have a substance abuse problem. It appears the social worker was unable to reach either mother in April.

During the April 2021 contested disposition hearing, the juvenile court concluded that the Agency had conducted adequate further inquiry with the Blackfeet tribe in January and April and that, given the tribe's lack of response, there was no reason to believe D.G. was an Indian child. It ordered D.G.'s continued detention in foster care and authorized liberal supervised visitation.

---

[4]    None of the ICWA letters or emails referenced in Agency reports appear in the record on appeal.

B.     *Reunification Period*

Between April and September, Mother had three supervised visits with D.G. per week, although she was late for most visits. She attended D.G.'s doctor's appointments and stayed in constant contact with the caregiver. She actively participated in a domestic violence group and was working through parenting education modules, but the Agency described her as being in the beginning stages of her groups. Although she enrolled in a substance abuse program in July and initially attended regularly, she stopped attending groups in September and then tested positive for methamphetamines and marijuana at the end of September. Meanwhile, B.G. made little progress on her case plan during this period. She did not obtain her substance abuse assessment or participate in groups geared towards domestic violence and parenting. The caregiver reported that B.G. had not visited D.G. since January 2021. At the six-month review hearing, the court found that both mothers' progress toward alleviating the causes of placement was minimal.

D.G. continued to do well with her caregivers, having overcome her initial failure to thrive. She learned sign language, took swimming lessons, and developed a positive attachment to the caregiver's other child.

In September 2021, Father reached out to Mother and requested a paternity test. The court appointed counsel for Father and ordered paternity testing.

Mother was removed from her domestic violence group in November due to lack of attendance, but completed her parenting program the same month. She testified that the substance abuse program she had been attending was frequented by "a lot of familiar faces" she found triggering, so after being discharged from that program, Mother requested inpatient treatment. The Agency reported that Mother was actively using drugs and

8

had yet to enroll in intense substance abuse treatment. Mother admitted she used marijuana and methamphetamine when she was nervous and stressed and that she needed to attend her groups and find a sponsor. Mother did continue to visit D.G. three times per week, though, and the caregiver reported that Mother did well with D.G.

During the same reporting period, B.G. did not engage in services or consistently visit D.G. Father did not visit while waiting for his paternity test results. An Agency investigation revealed that Father was homeless, on probation, and suspected of using methamphetamine. In January, Father received confirmation of paternity and visited D.G. once.

At the March 4, 2022 contested 12-month review hearing, the court elevated Father to biological father status but denied his request for reunification services. Father indicated that D.G.'s maternal great grandmother told him he had native American ancestry. He did not know which tribe, but he believed his mother and sister might have more information and provided their contact information to the Agency. In light of this information, the court stated that "the ICWA inquiry is now back alive" and ordered the Agency to further inquire as to Father's ICWA status. The court terminated reunification services as to both mothers, granted de facto parent status to the caregivers, and scheduled a section 366.26 hearing.

## II.

### *Permanency Planning*

In its March 2022 addendum report, the Agency noted that B.G. had not engaged in services or visited D.G. Mother had supervised visits twice a week with D.G. and a social worker observed her to be affectionate and bonded with the child. But Mother avoided all but two drug tests between

December 2021 and March 2022, and when she did test in January, Mother was positive for methamphetamines.

On April 20, 2022, Mother reported that Father hit her on the head with his fists and a speaker and slashed her tires. Five days later, Mother completed intake at an inpatient substance abuse treatment facility. Father visited D.G. twice in April but was late for both visits. The visitation center then closed the referral due to Father's failure to respond to calls. Meanwhile, Father tested positive for drugs and his parole officer indicated there was an active warrant for his arrest.

One of Father's sisters, Aunt N., reported that the family had Indian ancestry, but did not know which tribe. When a social worker called her again in May, she said she did not have any information about any of her family members having Native American heritage. Aunt N. asked if the social worker would like to speak with the paternal grandmother, who was there with her. The paternal grandmother stated that she had never heard of anyone in her family having Native American heritage.

Father's other sister, Aunt S., provided the Agency with documentation that a great, great, great grandfather named John[5] "ha[d] heritage of 1/16 Cherokee." In May, Aunt S. told the ICWA liaison and a social worker that she had located a document entitled "Cherokee Roll, Indians by Blood" that listed only the paternal great, great, great, great grandfather's second or third wife Hattie and her children. As she had been a stepmother to John, it appeared his descendants would not have had Native American heritage. Furthermore, Aunt S. explained that she and Father did not share the same father. Aunt S. inquired further of another aunt, who stated that she could

_____

[5] The record is not clear as to whether this is D.G.'s great, great, great grandfather or the aunt's.

not provide any additional information and that no other family members would know more history.

In late May 2022, the ICWA liaison called Mother's adult daughter and left a message asking if her family had any Native American heritage. The Agency then requested a continuance to further pursue the ICWA investigation and assess other placement options. The court granted the request and ordered the Agency to conduct further inquiry to determine whether D.G. was an Indian child.

Although D.G. continued to progress developmentally, she was diagnosed with autism spectrum disorder and began receiving 20 hours of home services per week. Her caregiver also took her to weekly occupational therapy, speech therapy, and early education services.

D.G. visited with Mother from May through early September. Before Mother even arrived for the first two visits, D.G. had thrown herself on the floor because she wanted to play on the playground structure outside of the building. Mother was nonetheless able to engage D.G. for part of these visits, but D.G. also played by herself at times and resisted Mother's touch. The same was true during additional visits in May and June. Mother was late for a visit in July and did not show up for one visit in August and another in September. Both times, she and Father offered identical excuses for missing their visits. During a September visit, Mother began to doze off on the floor and was woken up and given cold water by visitation staff. The visitation facility closed out Mother's referral due to lack of attendance later that month.

In August 2022, the caregiver expressed concern that Mother had relapsed because, as Mother had done when she previously used drugs, Mother had begun missing visits, arriving late, and failing to communicate

11

with the caregiver. In September, Father texted a social worker twice in one day stating that he did not think Mother should be able to visit D.G. for safety reasons, explaining that Mother had engaged in "excessive drug use" that had kept her awake for four days.

Mother then missed two visits at the CWS office in October because she said she was confused as to the location. She attended one visit that month and read to D.G., played with her, changed her diaper, and then kissed and hugged her goodbye. As with earlier visits, D.G. interacted with Mother for periods of time, but then screamed and pushed her away at other points. Mother acknowledged to a social worker that she and Father continue to have a relationship and be in communication.

In an October report, the Agency noted that the caregivers were bonded with D.G. and wished to adopt her. A social worker who supervised seven visits noted that it was hard for Mother to engage D.G., who wanted to play by herself and often ran away from Mother. She observed that D.G. no longer displayed affection for Mother and was not distressed when leaving after the visits. In the social worker's view, there was no emotionally significant parent-child relationship between Mother and D.G. and it would not be detrimental to D.G. to terminate Mother's parental rights. As neither Father nor B.G. had visited with D.G. in the months since the social worker became involved in the case, she could not assess their relationships. Overall, the social worker opined that the benefits of adoption were "much greater" for D.G. Accordingly, the Agency recommended terminating parental rights and ordering a permanent plan of adoption.

At an October 4, 2022 hearing, the Agency requested another continuance to assess relatives for placement. The court denied the request, finding the Agency had not shown good cause and it was not in the best

12

interest of the child.  But because the Agency had not provided a recommendation for a specific permanent plan, the court was unable to proceed with the section 366.26 hearing.  The court therefore scheduled a pretrial status conference and a contested section 366.26 hearing.

Mother filed a petition on October 20, 2022, under section 388 asking the court to change the March 4, 2022 order terminating her reunification services and setting a section 366.26 hearing.  She requested that the court place D.G. with her or, alternatively, transition D.G. to her care with services.  As evidence that her circumstances had changed, Mother submitted documentation showing that she had completed a 90-day drug treatment program and was asked to speak at her treatment program's completion ceremony.  She also offered proof that she had been prescribed medication to treat her mental health issues, attended a mental health program, and regularly visited D.G.  Mother asserted that she had addressed the issues that brought D.G. into the system and maintained her bond with D.G.  In response, the Agency recommended denying the section 388 petition, noting that Mother had not addressed her domestic violence issues or followed up on aftercare substance abuse or mental health services.  The Agency also expressed concern that Mother was suspected of having relapsed.

### III.

### *The Contested Section 366.26 Hearing*

On November 10, 2022, the court addressed Mother's section 388 petition and then held a contested section 366.26 hearing.  After hearing argument, the court denied Mother's section 388 petition finding she had not made a prima facie showing of changed circumstances.  The court explained that, while Mother had presented evidence she engaged in mainly substance abuse services from April to July, the petition on its face did not indicate

13

what had happened between July and November. Mother also had not provided any evidence that she followed up with any of the recommended post-treatment services. Finally, the court highlighted that it had "no evidence that the main issue that brought this petition to this court has been addressed at all since that March 4th, 2022 date, and that's domestic violence." The court concluded that granting the requested relief would not be in D.G.'s best interest.

The juvenile court then allowed counsel to provide opening arguments regarding termination of parental rights. Mother's attorney argued that the bond Mother had with D.G. outweighed the benefits of adoption and called Mother to the stand to provide testimony. Mother began by testifying about her visitation schedule with D.G. and acknowledged that it was fair to say she was not "real regular" with her recent visits. However, she said that was because she forgot that the location of the visits changed and went to the wrong location, and then confused the day of the next visit. She also explained that she missed visits for medical reasons. First, she was hit by a car on September 29, 2022, which caused some back issues, made her dizzy, and resulted in difficulty keeping track of which location to go to for visits. She also stated that she had developed an abscess that caused so much pain that she "[couldn't] walk at all." This resulted in her missing one or two visits and having her visitation referral canceled. When she obtained a new referral, she said "that was the location change. And that's when I missed— that was like the first time the location changed." Due to the location and days changing, she said she went to the visits but went to the wrong location and was confused about the days. Mother also testified that she missed visits and some of D.G.'s doctor's appointments due to transportation issues before obtaining a bus pass.

14

When asked if she missed any visits due to being under the influence, Mother said no. But she acknowledged that she was not attending aftercare meetings on a regular basis.

Mother then talked about her bond with D.G. She said D.G. initiated affection with her, gave her hugs, and said "I love you." When asked if she had a strong bond with D.G., she replied "Yes. Most definitely." She expressed her view that it would be a problem for D.G. if she did not see Mother and they got out of their normal routine.

Mother's adult daughter also addressed the court. The court first asked if she was aware of any Native American heritage in the family, to which she responded "No. I'm not aware of it." The court then gave her an opportunity to speak about Mother and D.G. She said that she, her daughter, Mother, and D.G. "are a family together." She further asserted that D.G. loves Mother and "shows it every day when I do see her." The adult daughter said Mother understood her wrongs, and she expressed full confidence that Mother would continue to learn and progress.

The court concluded that D.G. was likely to be adopted if parental rights were terminated. It then evaluated whether the parental-benefit exception to adoption applied. As to the regular visitation element, the court noted that "[o]ver the course of this case, there were periods where there was consistent visitation, but there [were] also periods where there was not." Although it acknowledged that Mother missed some visits due to the detrimental things that happened to her, the court highlighted that even before some of those events, "she stated that she got the dates mixed up and the location mixed up." Additionally, the court said "other reasons throughout—things that predate those circumstances" resulted in Mother

15

missing visits. "Looking at the totality of the visitation, [the court could not] say that there was regular and consistent visitation."

For the second element, the court clarified that the question is whether maintaining the relationship would benefit the minor. To make this determination, the court said it must consider "the age of the child, the portion of the child's life spent in the parent's custody, the positive or negative affect [*sic*] of interaction between the parent and the child, and the child's particular needs." In this case, the court noted that "the minor ha[d] spent almost her entire life outside of the . . . care of the mother . . . and that has shaped the relationship, because the relationship isn't at a level where there is a bond in the direction of the minor to the mother." The court made clear that "[n]o one is doubting that [Mother] loves her daughter." But it pointed out that the question the court had to ask itself is "whether or not there is an attachment from the minor to the parent that . . . creates a beneficial relationship." It concluded "that second element is simply not met here based on all the reasons we have in the report and also the evidence that [the court] heard."

Even if such a relationship existed, the court concluded that the relationship with Mother was not so important in this case that it outweighed the security and stability of a new adoptive home. Accordingly, the court declined to find that the parental-benefit exception applied in this case. The court terminated parental rights as to all three parents, referred D.G. for adoptive placement, and designated the caregiver as a prospective adoptive parent.

DISCUSSION

I.

*The Juvenile Court Did Not Err in Denying Mother's Section 388 Petition*

Mother argues the juvenile court erred by summarily denying her section 388 petition without first conducting an evidentiary hearing. She contends that finishing her case plan and addressing the domestic violence and substance abuse issues that prevented her from regaining custody constituted the "changed circumstances" necessary to justify modification of the prior court order. She also maintains that modification of the March 2022 order was in D.G.'s best interest because they share a strong bond and having addressed her case plan allowed Mother to be an appropriate parent to D.G. Father joins in Mother's argument.

The Agency responds that Mother failed to make a prima facie showing of changed circumstances sufficient to justify modification of the juvenile court's order. It highlights the juvenile court's finding that Mother had not addressed domestic violence, the primary issue precipitating D.G.'s dependency, in her section 388 petition. While Mother claims to have completed her case plan, the Agency points out that the evidence shows she completed only six domestic violence group sessions and that she continues to engage with Father despite the two of them having a domestic violence altercation *after* Mother filed the section 388 petition. Additionally, the Agency submits that the evidence supports the juvenile court's conclusion that Mother has not engaged in aftercare treatment for her substance abuse issues and may not even have maintained her sobriety. Mother also did not provide evidence that she established the recommended ongoing psychiatric care or took the prescribed medication to treat her mental health issues. Because D.G. has spent most of her life with her caregivers who have

addressed her physical, developmental, and emotional needs, the Agency further contends that granting the requested relief would not be in D.G.'s best interest.

Under California's dependency scheme, the parent is given a reasonable amount of time to reunify with the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Once reunification services are terminated, the focus shifts to prioritizing the child's interests in permanency and stability. (*Ibid.*) However, section 388 provides an " 'escape mechanism' when parents complete a reformation in the short, final period after the termination of reunification services but before the actual termination of parental rights." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528 (*Kimberly F.*); *In re Marilyn H.*, at p. 309.)

Pursuant to section 388, a parent may, upon "grounds of change of circumstance or new evidence," petition to change, modify, or set aside a prior order of the court. (§ 388, subd. (a)(1).) The petitioning parent bears the burden of showing by a preponderance of the evidence that: (1) there has been a change of circumstance or new evidence since the challenged court ruling; and (2) the proposed modification is in the child's best interests. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*); *In re J.M.* (2020) 50 Cal.App.5th 833, 845 (*J.M.*); see § 388, subds. (a)(1) & (d).) A section 388 petition should be liberally construed in favor of its sufficiency. (*In re D.R.* (2007) 155 Cal.App.4th 480, 487.)

The moving party is entitled to an evidentiary hearing on the section 388 petition if they have made a prima facie showing of the two requisite elements. (*In re J.P.* (2014) 229 Cal.App.4th 108, 127.) A prima facie showing is made when "the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition."

18

(*Ibid.*) " '[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition.' [Citations.]" (*In re Daniel C*. (2006) 141 Cal.App.4th 1438, 1445.) The juvenile court may consider the entirety of the "factual and procedural history of the case" in determining whether a prima facie showing has been made. (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.) We review an order summarily denying a section 388 petition without an evidentiary hearing under an abuse of discretion standard. (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1158.)

The juvenile court concluded that Mother did not present evidence that she addressed the primary issues leading to dependency jurisdiction. This decision is amply supported by the record. Indeed, " '[n]ot every change in circumstance can justify modification of a prior order.' " (*In re N.F.* (2021) 68 Cal.App.5th 112, 120 (*N.F.*).) To be sufficient, the change must be material and substantial. (*Id.* at pp. 120, 121, fn. 3.) Moreover, the parent must establish that "during the period between termination of reunification services and the permanency planning hearing, he or she has resolved the previously unresolved issues supporting juvenile court jurisdiction." (*J.M.*, *supra*, 50 Cal.App.5th at p. 846.) In this case, the court removed D.G. following two domestic violence incidents, yet Mother did not attend all of her domestic violence treatment groups. She also openly continued to interact with Father in the months after filing her section 388 petition, even after he punched her in the head and hit her with a speaker. Thus, there is little evidence Mother addressed the domestic violence concerns that lead to D.G.'s removal.

19

Mother also provided no evidence that she pursued the substance abuse, psychiatric, or mental health aftercare treatment that was recommended to ensure she maintained her sobriety and mental health progress. As the juvenile court pointed out, Mother presented evidence that she engaged in treatment from April to July 2022. But even though she did not file her section 388 petition until late October, Mother offered no evidence that she continued to address her substance and mental health issues after being released from her inpatient treatment program. Nothing in the record indicates she enrolled or participated in the outpatient recovery program, continued to receive psychiatric care, or actually took the medication prescribed to treat her mental health issues. To the contrary, Mother told a social worker in October that she had not had time to do the initial paperwork for the recovery center and had not found a psychiatrist near where she lived. As for her medication, she provided only a copy of her initial prescription, which offered no insight into her compliance with treatment.

The juvenile court was particularly justified in questioning whether Mother's lack of follow-up constituted changed circumstances given evidence that Mother had relapsed. "In the context of a substance abuse problem that has repeatedly resisted treatment in the past, a showing of materially changed circumstances requires more than a relatively brief period of sobriety or participation in yet another program." (*N.F., supra,* 68 Cal.App.5th at p. 121.) In August, the caregiver questioned Mother's continued sobriety, and Father outright confirmed in September that Mother was engaging in "excessive drug use" and represented a safety threat to D.G. The Agency continued to express concern in its November 2022 report that Mother might be using drugs. Given that she had a criminal history related to drug use from 2005 to 2013 and relapsed in 2021, the court could

20

reasonably conclude that a three-month period of sobriety did not constitute changed circumstances. (See *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [for the purposes of a section 388 petition, the parent's recent sobriety reflected changing, rather than changed circumstances, where the parent had a history of drug relapses, was in the early stages of recovery, and was still addressing a chronic substance abuse problem].)

Furthermore, even if her circumstances had changed, Mother fell short of establishing a prima facie case that modification of the court's order would be in D.G.'s best interest. Because she filed her section 388 petition after reunification services were terminated, Mother's "interest in the care, custody and companionship of the child [was] no longer paramount. Rather, at this point 'the focus shift[ed] to the needs of the child for permanency and stability . . . .' " (*Stephanie M., supra,* 7 Cal.4th at p. 317.) The child's best interests are not served by "further delay[ing] permanency and stability in favor of rewarding Mother for her hard work and efforts to reunify." (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

By the time Mother filed her section 388 petition, D.G. had lived with her caregivers for two years, having spent only the first five months of her life with Mother. Although D.G. would sometimes play, sing, or read with Mother, she often rebuffed Mother's physical affection and was never in distress when leaving visits. Mother acknowledged that D.G. only called her "Mommy" when prompted by the caregiver.

By contrast, the caregivers helped D.G. overcome her initial failure to thrive diagnosis, had her evaluated when they became concerned about her developmental progress, and ensured that she obtained the 20 hours of services her subsequent autism diagnosis required. The caregivers also took D.G. to regular speech, occupational, and early education therapy sessions, in

addition to independently pursuing swimming lessons and home education. D.G. was described as having "formed a secure bond with her caregivers." She also bonded with the caregivers' child, and they considered her to be their daughter.

Under these circumstances, there was nothing arbitrary about the court's conclusion that, even liberally construed, Mother's allegations failed to demonstrate that the proposed change would promote D.G.'s best interest. (See *Stephanie M.*, *supra*, 7 Cal.4th at p. 318 [a court abuses its discretion only when it "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination"].) Here, significant evidence supports the court's decision that an evidentiary hearing was not warranted. The record shows the caregivers provided stability for D.G. for two years and addressed all her developmental needs. They expressed a desire to adopt her and give her a permanent home. Although Mother testified about her positive relationship with D.G., she offered no insight into how she would provide long-term stability for D.G. or meet her extensive therapy needs, given the ongoing tumult in her life. On this record, it was reasonable for the juvenile court to conclude it was not in D.G.'s best interest to return her to Mother's care.

Accordingly, we conclude that the juvenile court did not abuse its discretion in summarily denying Mother's section 388 petition.

## II.

*The Juvenile Court Did Not Err in Terminating Mother's Parental Rights*

Mother argues the juvenile court erred in failing to apply the parental-benefit exception to overcome the statutory preference for adoption. Father joins in this argument as well. The Agency submits that Mother did not satisfy the threshold requirements to show the exception applied.

22

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 70 Cal.App.5th 833, 851–852.) At this hearing "the juvenile court has three options: (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care. [Citation.] Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan. [Citation.] The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

One of the exceptions to the preference for adoption is the parental-benefit exception. (§ 366.26, subd. (c)(1)(B)(i).) For this exception to apply, the parent must show by a preponderance of the evidence: (1) "regular visitation and contact with the child"; (2) "the child has a substantial, positive, emotional attachment to the parent"; and (3) "terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

The first element, visitation, is "straightforward," requiring that the " 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra,* 11 Cal.5th at p. 632.) The second element focuses on the child and is determined by taking into consideration factors such as " 'the age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*) For the third element, "the court must decide whether it would be harmful to the child to

sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Id.* at p. 633.) If the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Id.* at p. 634.)

When deciding whether terminating parental rights would be detrimental to the child, the court is not comparing the parent's and custodial caregiver's attributes. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Additionally, a parent's lack of progress in addressing the issues that led to dependency is not determinative. (*Id.* at p. 637.) Nonetheless, a parent's inability to address the issues leading to dependency can be relevant in assessing whether the interaction between parent and child "has a 'negative effect' on the child." (*Ibid.*) Performing this analysis is a "subtle enterprise." (*Id.* at p. 634.) And "[i]n many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Ibid.*)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.) "We review its ruling on the third element under a hybrid standard,

reviewing its factual determinations concerning the detriment analysis for substantial evidence but its ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion." (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068.)

Here, the juvenile court found Mother failed to carry her burden of establishing any of the elements of the parental-benefit exception to adoption. Substantial evidence supports this determination, and we conclude the court did not abuse its discretion in terminating Mother's parental rights.

Addressing the first element, the court note that "there were periods where there was consistent visitation, but there [were] also periods where there was not." The record supports this conclusion. Mother missed most of the virtual visits facilitated by the caregiver in January 2021, and the FVC closed Mother's case the same month due to failure to attend visits and tardiness at their facility. Mother visited D.G. four times in March 2021, and then had three supervised visits per week between April and September, although she was late for most of those visits. As of April 2022, Mother was consistently visiting D.G. twice a week. However, Mother was late for a visit in July and did not show up for a few visits in August and September. The FVC again closed her referral due to lack of attendance in September 2022. Even acknowledging Mother's testimony that she missed visits in late September because she was hit by a car and suffered other health issues, the court noted Mother's testimony that she missed earlier visits because she was confused as to the date and location of the visits.

Although this record presents a closer call than some, substantial evidence supports the juvenile court's conclusion. While another juvenile court might look at the same history and find Mother's visitation sufficiently consistent to meet the standard, the juvenile court's determination "should

25

'be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' " (*Caden C., supra,* 11 Cal.5th at p. 640.) Accordingly, we conclude the juvenile court's conclusion on the first element is supported by substantial evidence.

Even assuming she met this threshold element, we agree that Mother failed to show D.G. would benefit from continuing the relationship. As the juvenile court correctly stated, the focus at this stage in on the benefit to the *child*, and includes consideration of factors such as " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (See *Caden C., supra,* 11 Cal.5th at p. 632.) In this case, D.G. was only two and a half years old at the time of the section 366.26 hearing and had lived apart from Mother for most of her life. While Mother visited her throughout their separation, D.G.'s primary interactions and bonds were with her caregivers, and they addressed her significant therapy needs.

Although no one, including the court and the caregiver, doubted that Mother loved D.G., the juvenile court correctly determined that its focus must be on "whether or not there is an attachment *from the minor* to the parent that . . . creates a beneficial relationship." (Italics added.) In assessing this attachment, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C., supra,* 11 Cal.5th at p. 632.) The evidence in this regard showed that in the months preceding the hearing, D.G. often ran the opposite way when Mother approached her, forcefully pushed herself away or twisted her body loose when Mother hugged her, said "no" or "all done" when Mother touched her, and cried when Mother grabbed

and held her.  A social worker stated that D.G. never showed distress when leaving Mother.  And even Mother acknowledged that D.G. "goes and finds what she's going to play with" and "doesn't want to be bothered."

In fairness to Mother, the desire to play independently with toys may simply be characteristic of a two-year-old child.  Nonetheless, even if we attribute some of D.G.'s negative behavior to her age, Mother has not put forth countervailing affirmative evidence showing that D.G. "has a substantial, positive, emotional attachment" to her. (*Caden C., supra,* 11 Cal.5th at p. 636.)  For a child of that age, the reports indicating that D.G. never showed distress when separating for Mother, did not return affection, and was too young to recall having lived with Mother provide substantial evidence supporting the juvenile court's conclusion.

Only if Mother had satisfied the first two elements of the parental-benefit test and demonstrated that terminating the relationship would be detrimental to D.G. "even when balanced against the countervailing benefit of a new, adoptive home," could the court find the exception applied.  (*Caden C., supra,* 11 Cal.5th at p. 636.)  Such is not the case here.  The benefits of D.G.'s prospective adoptive home are significant.  She requires over 20 hours a week of therapy and receives four different kinds of services.  The caregivers have maintained this schedule and provided D.G. with stability and affection.  Although Mother clearly loves D.G. and they have had many positive interactions with each other, it cannot reasonably be said that D.G.'s relationship with Mother is so important to her that "the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]" (*Caden C., supra,* 11 Cal.5th at p. 632.)  Accordingly, we conclude substantial evidence supported the

court's factual findings and the juvenile court did not abuse its discretion in declining to apply the parental-benefit exception to adoption.

III.

*Limited Remand for ICWA Compliance is Appropriate*

Father, joined by Mother, contends the Agency and the court failed to comply with the burden of further inquiry required by ICWA and section 224.2. We agree.

Congress enacted the ICWA to address rising concern that Indian children were being separated from their tribes through adoption or foster care and placed with non-Indian families. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).) California subsequently enacted its own statutes specifying the steps the Agency and juvenile courts are required to take to determine whether a child is an Indian child before making placement decisions. (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048 (*D.S.*).) Under these statutes, the juvenile court and the Agency have an "affirmative and continuing duty to inquire" during dependency proceedings whether a child "is or may be an Indian child." (§ 224.2, subd. (a).)

"This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566 (*D.F.*).) In the first phase, the Agency's initial duty requires it to, at a minimum, inquire from the party reporting child abuse or neglect whether they have information that suggests "the child may be an Indian child." (§ 224.2, subd. (a).) In the second phase, "if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' " (*D.S.*, *supra*, 46 Cal.App.5th at p. 1052.) In the third stage, "if that further

28

inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply." (*Ibid*.)

Here, both Mother's and Father's claims of possible Indian heritage created a reason to believe D.G. might be an Indian child. This triggered the Agency's duty of further inquiry. (*In re E.C.* (2022) 85 Cal.App.5th 123, 147 (*E.C.*) ["the majority view is that a report of possible Indian ancestry . . . is sufficient to trigger the duty of further inquiry"].) Although Father is correct that the juvenile court's March 4, 2022 minute order states that "the court has reason to *know* the child may be an Indian child" (italics added), the transcript of the hearing reflects that the court struck the Agency's recommended finding that ICWA did not apply and instructed that it be replaced "with a *further inquiry* order." (Italics added.) (See *People v. Smith* (1983) 33 Cal.3d 596, 599 [when the clerk's minutes and the record are in conflict, the reporter's transcript shall prevail].) This occurred after Father's counsel advised the court that "the maternal great grandmother—told him he has Native American Ancestry, but he doesn't know what it is." Taken together, this information makes clear that Father and the court had reason to *believe* D.G. was an Indian child, but not reason to *know*. Had it been otherwise, the court would have instructed the Agency to provide formal notice to the tribes as opposed to requiring further inquiry. (See § 224.2, subds. (e) & (f).)

The Agency contends it satisfied its ICWA inquiry obligations as to Father's family but concedes ICWA error in complying with its statutory duty of further inquiry with regard to Mother's side of the family. Although neither party expressly appealed the juvenile court's ICWA finding as to Mother's side of the family, we conclude for the following reasons that Father's appeal of the order terminating parental rights based on ICWA error

29

and Mother's joinder of the same sufficiently encompasses this issue. First, as previously noted, the Agency and the juvenile court have a continuing duty to inquire about ICWA status. (§ 224.2, subd. (a).) What the juvenile court ultimately must determine is whether the Agency (1) conducted "proper and adequate further inquiry" and (2) provided the juvenile court with a sufficient factual basis upon which to conclude that the child was or was not an Indian child. (*In re K.H.* (2022) 84 Cal.App.5th 566, 605 quoting § 224.2, subd. (i)(2).) It would yield an incomplete result if we evaluated the juvenile court's conclusion as to only one side of the child's family simply because the appeal did not specifically mention the inquiry regarding the other side of the family. The focus is on the child and whether the record as a whole contained a sufficient factual basis for the juvenile court to assess the child's ICWA status. (See *E.C., supra,* 85 Cal.App.5th at p. 157 [explaining that when assessing whether an inquiry error is prejudicial and requires reversal, it is not always appropriate to solely "focus on the specific deficiency identified by the appellant" because "courts must take care to assess the inquiry as a whole for adequacy"].) Second, "Indian tribes have interests protected by ICWA that are separate and distinct from the interests of parents of Indian children." (*Isaiah W., supra,* 1 Cal.5th at p. 13.) Our Supreme Court has made clear that a parent cannot waive ICWA notice because it interferes with the tribe's rights to intervene in the case (*Isaiah W., supra,* Cal.5th at pp. 13–14; see also *In re Samuel P.* (2002) 99 Cal.App.4th 1259, 1267 ["The notice requirements serve the interests of the Indian tribes 'irrespective of the position of the parents' and cannot be waived by the parent"]) and we think the same logic applies here. Narrowly construing the appeal as applying only to Father's side of the family risks allowing Mother to forfeit the tribe's right to become involved if D.G. is found to be an Indian child.

(See generally *In re K.H., supra,* 84 Cal.App.5th at p. 606 ["The relevant injury is the failure to gather the information necessary to make those determinations in the first instance, and it is this gathering of information which serves to ensure that the rights of tribes are protected as envisioned by ICWA and related California law"].) Finally, this is not a situation where construing the issue more broadly would result in unfairness as the Agency not only was aware of the issue but brought it to the fore by offering a concession in its briefing. Accordingly, we liberally construe Father's appeal of the order terminating parental rights, and Mother's joinder of the same, as challenging the sufficiency of all of the evidence underlying the juvenile court's conclusion that ICWA did not apply.

As to this claim, we conclude the Agency's concession is proper. Rule 5.481(a) of the California Rules of Court required the Agency to file "all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes." (Cal. Rules of Court, rule 5.481(a)(4) & (5).) When there is reason to believe a child is an Indian child, the Agency must conduct a further inquiry *and* provide "*documentation* regarding to whom the [Agency] may have directed ICWA inquiries and what responses, if any, were received." (Italics added). (*E.C., supra,* 85 Cal.App.5th at pp. 147–148; see also *In re M.E.* (2022) 79 Cal.App.5th 73, 85 [concluding substantial evidence did not support the juvenile court's finding that the ICWA did not apply where the agency did not provide any information regarding what investigation the investigator undertook, what information was sent to the tribes, or when that information was sent]; *In re S.R.* (2021) 64 Cal.App.5th 303, 317 [requiring that, "[a]fter these further inquiries, the department shall notify the court of its actions and file certified mail return receipts for any ICWA notice they

31

sent, as well as any responses"].)  Although Agency reports reflect that the ICWA liaison sent informal inquiry letters and emails to the tribes in January and April 2021, these letters and emails were not attached to the reports and are not included in the appellate record.  Absent this documentation, it is not clear what evidence the juvenile court relied upon in finding that ICWA did not apply.  Accordingly, we conclude the Agency did not adequately comply with its duty of further inquiry and, as a result, the juvenile court's ICWA finding was not supported by substantial evidence.

We also conclude the error is prejudicial.  "Where the opportunity to gather the relevant information critical to determining whether the child is or may be an Indian child is lost because there has not been adequate inquiry and due diligence, reversal for correction is generally the only effective safeguard." (*E.C., supra,* 85 Cal.App.5th at p. 155.)  This is because "[a] finding of harmlessness on this record would necessarily require speculation [which] 'is at odds with the statutory protections that ICWA and California law intend to afford Indian children and Indian tribes.' " (*Ibid.*)  We will not speculate as to whether the Agency offered the juvenile court documentary proof of its efforts to contact the Blackfeet tribe regarding Mother's ancestry.  Because none was included in the appellate record, the error is prejudicial.

We therefore conditionally reverse the juvenile court's order terminating parental rights and remand the matter to the juvenile court so the Agency may comply fully with ICWA and the court may make such further findings as are necessary under section 224.2.

In light of our decision to remand the case for further proceedings to determine whether ICWA applies, we decline to address Father's contentions as to his side of the family.[6]

Given the importance of expediency and need for finality, we encourage the parties to stipulate to immediate issuance of the remittitur in this case. (Cal. Rules of Court, rule 8.272(c)(1).)

## DISPOSITION

The November 10, 2022 order terminating parental rights under section 366.26 is conditionally reversed. The matter is remanded to the juvenile court with directions that, within 30 days of the remittitur, the Agency must file a report with the appropriate evidence attached demonstrating its compliance with the further inquiry provisions of section 224.2, subdivision (e), and, if applicable, the duty to provide notice to the pertinent tribes (25 U.S.C. § 1912(a); Welf. & Inst. Code, § 224.3). Within 45 days of the remittitur, the juvenile court must conduct a hearing to determine whether the Agency's investigation satisfied its affirmative duty to investigate. The juvenile court has the discretion to adjust these time periods on a showing of good cause.

---

[6] However, we reiterate that our remand is conditional and for the purpose of correcting the deficiencies identified. "ICWA does not obligate the court or [the Agency] 'to cast about' for investigative leads." (*In re A.M.* (2020) 47 Cal.App.5th 303, 323.)

If neither the Agency nor the juvenile court has reason to believe or to know that D.G. is an Indian child, the order issued at the November 10, 2022 contested section 366.26 hearing shall be reinstated by the juvenile court. Alternatively, if after completing the inquiry the Agency or the juvenile court has reason to believe that D.G. is an Indian child, the court shall proceed accordingly.

HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.